## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

_____

PAULA RIVERA,

                              Plaintiff,

                                                         DECISION AND ORDER

-vs-

                                                         04-CV-6149 CJS

JO ANNE B. BARNHART,
Commissioner of Social Security,

                              Defendant.

_____

### APPEARANCES

For the Plaintiff:              Empire Justice Center[1]
                                By: Catherine M. Callery, Esq., of Counsel
                                80 St. Paul Street, Suite 660
                                Rochester, NY 14604
                                (585) 295-5727

For the Defendant:              Kathleen Mehltretter, Acting United States Attorney
                                United States Attorney for the
                                Western District of New York
                                By: Brian McCarthy, Esq.
                                Assistant United States Attorney
                                100 State Street
                                Rochester, New York 14614

### INTRODUCTION

**Siragusa, J.** This is an action brought pursuant to 42 U.S.C. § 405(g) to review the

final determination of the Commissioner of Social Security ("Commissioner") who denied

plaintiff's application for disability and Supplemental Security Income ("SSI") benefits. Now

before the Court is the Commissioner's motion for judgment on the pleadings, and

plaintiff's cross-motion seeking reversal of the Commissioner's decision and a finding that

_____

[1]Formerly "Greater Upstate Law Project, Inc."

she is entitled to disability insurance and SSI benefits as of her 50th[2] birthday. For the reasons stated below, the Commissioner's decision denying benefits is reversed, and the case is remanded pursuant to sentence four of § 405(g) for further administrative proceedings.

## BACKGROUND

Plaintiff claims that she has been disabled due to back problems. Record at 97, 132, 140. However, the Commissioner found that from June 2, 1997, plaintiff's alleged onset date, to January 25, 2000, the date of the ALJ's decision, plaintiff was capable of performing work in the national economy. (Record at 201-10.)

### *Procedural history*

Plaintiff filed applications for disability insurance and SSI benefits on September 25, 1995. (Record at 89-92, 113-16.) These applications were denied initially (Record at 93-96, 99, 117-21), and also upon reconsideration (Record at 108-12, 122-26). Thereafter, on May 14, 1997, pursuant to plaintiff's request a hearing was held before Administrative Law Judge ("ALJ") James E. Dombeck at which plaintiff appeared with counsel and testified. (Record at 39-88.) ALJ Dombeck considered plaintiff's case *de novo* and, on June 26, 1997, issued a decision denying plaintiff's claim based upon his finding that she could perform medium work. (Record at 26-33.) This became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on June 17, 1998. (Record at 21-23.)

---

[2]Plaintiff initially alleged that she was disabled since July 1, 1995 (Record at 89, 132), but at the September 30, 1999 hearing before an Administrative Law Judge, changed the onset date to the date of her 50th birthday, June 2, 1997. (Record at 268.)

Thereafter, plaintiff filed a civil action in the United States District Court for the Western District of New York. By Stipulation and Order dated March 4, 1999, the case was remanded for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g). (*See* Judgment, *Rivera v. Apfel*, No. 98-CV-6348CJS (Mar. 8, 1999); Record at 212-16.) By Order dated April 30, 1999, the Appeals Council vacated the ALJ's decision, and remanded the matter for further administrative proceedings. (Record at 217-18.)

On September 30, 1999, a second hearing was held before ALJ Dombeck. (Record at 265-98.) Once again, plaintiff appeared with counsel and testified. (*Id.*) ALJ Dombeck for a second time considered plaintiff's case *de novo* and, on January 25, 2000, issued a decision again denying plaintiff's claim based upon his finding that she could perform medium work. (Record at 201-10.) This second decision, which became the final decision of the Commissioner on February 5, 2004, when the Appeals Council denied plaintiff's request for review, is the subject of the instant action.

In that regard, plaintiff alleges that she has been disabled since June 2, 1997, due to back problems. (Record at 97.) Plaintiff met the disability insured status requirements of the Act on her alleged date of disability and continued to meet these requirements through December 31, 1999. (Record at 127, 209.)

### Non-Medical Evidence

At the hearing before the ALJ, plaintiff testified that she was born on June 2, 1947 in Puerto Rico and completed eight years of schooling  there.[3] (Record at 89, 46.) Additionally, plaintiff testified that she could not read or write in English, although she could

---

[3] Although an interpreter was present at the administrative hearing, she sometimes had difficulty translating questions, since plaintiff kept responding before the translator could finish interpreting the question. (Record at 286.)

play word find puzzles in English, she stated, because she could find the matching letters. (Record at 286.) Plaintiff indicated that she previously worked as an office cleaner and maintenance supervisor (Record at 290), and that she was able to communicate with her coworkers in Spanish since most spoke that language. (Record at 290-91.)

Plaintiff stated that she could not work because she "cannot make strength . . . make an effort … cannot walk too long … [or] lift anything heavy." (Record at 271.) She explained that she has a lot of pain in her hips with pain and cramping down into her legs. (Record at 271-72.) She further stated she had gone to therapy several years prior (about twelve to fifteen sessions), but could not continue because of pain. (Record at 272-73.) Aside from taking medication (ibuprofen), plaintiff testified that she used ice gel and Vicks vaporub to alleviate the pain. (Record at 274.) She also said that her doctor[4] also recommended that she use a "hot bag" when she lies down. (*Id*.) Plaintiff explained that when she was unable to take her medication on time, she has to lie down because the pain is so severe. (Record at 274-75.) She also stated that she takes her medication around 8:00 a.m. and that it provides three to four hours of relief. (Record at 280.) During that time, she related, the pain is there, "but not that much." (*Id*.) Plaintiff testified that walking more than half a block exacerbated her pain and that she could only sit for about fifteen minutes to half an hour and then must change position. (Record at 281-82.) She explained that she lived alone and her daughters helped with laundry, heavy cleaning and taking her shopping. (Record at 283-84.) However, she also stated that she was capable of caring for her personal needs and performing light house chores. (Record at 283.)

---

[4]Presumably Dr. Elizabeth Romero.

***Medical Evidence***

Dr. C. Markou[5] saw plaintiff on February 7, 1995, the first documented visit for back problems in the record. (Record at 158.) At that visit, plaintiff related that she had been suffering from low back pain for the past eight years. *Id*. Dr. Markou wrote, "[s]he can not recall any precipitating factors or events.   Since falling down stairs last 11/94, she has increased back pain." (*Id.*) Dr. Markou's examination notes state, "[b]ack: good range of motion but w/ pain." (*Id*.) As plaintiff points out in her memorandum of law, the straight and crossed-leg raising tests were both negative. (Pl.'s Mem. of Law at 3; Record at 157.) Dr. Markou diagnosed chronic low back pain and recommended rest, continuation of pain medications (noted as Tylenol and Aleve), minimal lifting (only small amounts), and an orthopaedic consultation. (Record at 157.) Evidently, as of February 18, 1995, the orthopaedic consultation had not been scheduled. (Record at 155.)

Kathy DeMott, MS, FNP (described by plaintiff as a family nurse practitioner), saw plaintiff on May 12, 1995. (Pl.'s Mem. of Law at 4; Record at 152.) Nurse DeMott noted that plaintiff was "limping slightly" but had "good forward flexion and lateral bending." (*Id.*) She also wrote, "[s]he has positive contralateral straight leg raising with pain on the right when the left leg is at approximately 60 degrees." (*Id.*) Nurse DeMott's assessment was chronic low back pain and she wrote that she would "schedule CT scan" and that she had given her "Relafen samples to try, 500 mg. bid, and advised her to discontinue the Daypro." (*Id.*) A hand-written note on the progress notes from May 12, 1995 and dated May 16 states, "no coverage for CT. KD." (*Id.*)

---

[5]Dr. Markou's first name does not appear in the notes in the Record.

Nurse DeMott's progress notes form May 25, 1995 state that, while plaintiff was unable to have the CT scan due to lack of medical insurance, she was in the process of applying for Medicaid. (Record at 151.) Nurse DeMott also wrote, "[p]atient tells me that the Relafen is helping some but she continues to have discomfort. She also continues to work as a maid. She does have radiation into her legs occasionally but generally speaking is moving fairly well." (*Id.*) Nurse DeMott planned to follow up with either a CT or MRI once plaintiff's Medicaid was approved and advised plaintiff in the meantime to continue with Relafin, rest as much as possible and not to do any heavy lifting. (*Id.*)

Plaintiff's primary treating physician during the two hearings involved in this case was Dr. Elizabeth Romero. Dr. Romero first saw plaintiff on August 17, 1995. (Record at 150, 9.) Dr. Romero's examination revealed "some slight point tenderness located along the L3–4 area, negative leg raise tests, range of motion within normal limits and reflexes at 2+ bilaterally. (Record at 150.) Her assessment was chronic low back pain and she ordered an MRI of plaintiff's back, continued her on "anti-inflammatory therapy as needed prn." (*Id.*)

On August 28, 1995, plaintiff finally had an MRI. Dr. Romero reviewed the results of September 14, 1995 of the MRI. (Record at 149.) She noted that the MRI showed a degenerative disc with a tear of the annulus fibrosis posteriorly at L4–L5. (*Id.*) She also noted there was no disc herniation, or spinal stenosis. (*Id.*) The MRI report commented in part, as follows:

> There is an area of high signal surrounded by low signal at the level of L4-L5 posteriorly on T2 weighted images. This likely represents a tear of the annulus fibrosis. This is of doubtful clinical significance. There is no focal disc herniation or spinal stenosis at any level.

(Record at 163.) Dr. Romero prescribed 800 mg. of Motrin twice a day as needed and advised plaintiff to avoid quick movements. (Record at 149.)

On November 22, 1995, State agency medical consultant Dr. Anthony Borgese completed an assessment of plaintiff's residual functional capacity. (Record at 100-07.) Dr. Borgese concluded that plaintiff could lift and/or carry up to fifty pounds occasionally and twenty-five pounds frequently. (Record at 101.) He also found that plaintiff could stand and/or walk for a total of six hours and sit for about six hours in an eight-hour day. (*Id.*) Dr. Borgese determined that plaintiff was not limited in pushing and pulling of arm and leg controls, could frequently (from one-third to two-thirds of the day) climb, balance, kneel and crawl and occasionally (up to one-third of the day) stoop and crouch. (Record at 101-02.)

Dr. Romero saw plaintiff again on March 11, 1996. (Record at 183.) At this time, plaintiff complained, among other things, of joint pain, which Dr. Romero diagnosed as early arthritis.

Plaintiff next saw Dr. Romero on May 7, 1996. (Record at 184.) On this occasion, plaintiff complained that she had "back pain all the time," and that the pain sometimes shot down her left leg. (*Id.*) Plaintiff reported that the Daypro "was helpful but pain never goes away completely." (*Id.*) Dr. Romero advised plaintiff to continue her medication, engage in back strengthening exercises and to avoid heavy lifting. (*Id.*)

On July 10, 1996, plaintiff returned to Dr. Romero complaining of worsening back pain over the prior two days. (Record at 185.) Plaintiff reported to Dr. Romero that, although she had not been working the past two days, the pain was shooting down her leg, that she was walking with a limp, that she could not carry anything, and that sitting did not relieve the pain. (*Id.*) Dr. Romero observed plaintiff "winces in pain when [changing]

positions." (*Id.*) Dr. Romero ordered another MRI, directed plaintiff to remain out of work through July 12, and continued plaintiff's medications. (*Id.*)

Plaintiff next saw Dr. Romero on September 14, 1996 for a review of the latest MRI and x-rays. (Record at 186.) Plaintiff, who was awaiting the result of her disability hearing, was not working. Dr. Romero observed that the x-rays showed minimal osteophytic[6] changes and slight reversal of the normal lumbar lordosis.[7]  She also noted that the MRI showed fairly degenerative disc disease especially at L4–L5 with bulging, but no disc herniation. (*Id.*; *see also* Record at 192 (MRI report by Dr. Robert B. Benazzi.) Dr. Romero prescribed 800 mg. of Ibuprofen and referred plaintiff to a neurosurgeon. Additionally, Dr. Romero completed a New York State Medical Report (Employment) in which she wrote that plaintiff should not perform any stooping, bending, lifting, carrying, pushing, pulling or anything at a high rate of speed, and could perform, to a limited extent, walking, climbing, standing and sitting. (Record at 193.)

Dr. Romero's notes from September 27, 1996 indicate that plaintiff was seen by a neurosurgeon, but that the neurosurgeon, Dr. James T. Maxwell, did not believe plaintiff "requires neurosurgical attack [sic]." (Record at 263 (Dr. Maxwell's letter); Record at 187 (Dr. Romero's notes).) Dr. Romero indicated that plaintiff "may work[,] however needs to find [a] sedentary job." (Record at 187.) On October 7, 1996, Dr. Romero did not approve a requested letter excusing plaintiff from work. (*Id.*)

---

[6]An osteophyte is a bony outgrowth, usually branched in shape. *Taber's Cyclopedic Medical Encyclopedia* at 1010 (2005).  Such changes are part of the differential diagnosis for osteoarthritis, or degenerative joint disease. *See The Merck Manual* at 449-451 (1999)

[7]Lordosis: abnormal anterior convexity of the spine. *Taber's* at 834.

On a Medical Evaluation Impairment form dated April 6, 1998, Dr. Romero indicated that she had been treating plaintiff for chronic back pain every two to three weeks since August 1995. (Record at 9.) Dr. Romero reported that plaintiff's back pain ranged from mild to severe and had begun in approximately 1987. (*Id*.) She stated that plaintiff's back pain was disabling and that lifting objects exacerbated the pain. (Record at 9-10.) Dr. Romero also stated that she had prescribed 800 mg. of ibuprofen. (*Id*.)

Dr. Romero also completed a residual functional capacity ("RFC") assessment in April 1998. (Record at 12-14.) She opined that plaintiff could only lift and/or carry up to five pounds at a time, could only stand and/or walk for a total of thirty minutes in an eight-hour day, and sit for a total of less than twenty minutes in an eight-hour day. (Record at 12-13.) She also identified occasional (up to one-third of an eight hour day) postural limitations, including climbing, balancing, stooping, crouching, kneeling and crawling, and limitations in handling, pushing and pulling. (Record at 13.) Finally, she stated that plaintiff could not work at height or near moving machinery or in temperature extremes or around vibrations. (Record at 14.)

In an undated letter, Dr. Romero explained that her April 1998 RFC assessment was more[8] restrictive than her 1996 assessment because she believed that plaintiff's condition had worsened. (Record at 8.) She stated that even though the "physical findings have not necessarily changed, [plaintiff's] complaints of back pain have increased." (*Id*.) Dr. Romero asserted that she had known plaintiff and her family for many years and believed that her

---

[8]Dr. Romero's statement is confusing as the Record contains one report from September, 1996 which is more restrictive than the 1998 assessment. (*Cf.* Record at 12-14 *with* Record at 193.) In the 1996 opinion, Dr. Romero opined that plaintiff was not capable of working in any capacity at that time. Record at 193. She also found that plaintiff had a limited ability to walk, climb, stand and sit, but could not stoop/bend, lift/carry or push/pull. (*Id*.)

complaints were genuine. (*Id*.) Finally, Dr. Romero concluded that plaintiff's condition had worsened even further since her recent gallbladder surgery in April, 1998. (*Id*.)

On April 6, 1999, plaintiff saw Dr. Romero complaining chiefly about back pain. (Record at 245.) The Record is unclear as to whether any examination was performed, but shows that Dr. Romero prescribed Arthrotec.[9] (*Id*.) However, at her next visit with Dr. Romero on June 15, 1999, plaintiff reported feeling better and indicated that she had stopped using the Arthrotec because Tylenol helped her pain better. (Record at 246.)

In correspondence dated August 30, 1999, and addressed "To Whom It May Concern," Dr. Romero wrote that, "in response to your letter dated August 26, 1999 requesting information" on plaintiff, she "continues to be under my care for her condition. My opinion regarding her work capacity has not changed since my original opinion dated April 1998." (Record at 234.)

Consultative Examiner Dr. Samuel Balderman examined plaintiff on October 20, 1999. (Record at 255-58.) Plaintiff had reported to Dr. Balderman that she had a five year history of back pain. (Record at 255.) She stated to him that she could walk at half-block intervals, stand for twenty minutes at a time, sit for thirty minutes at a time and lift and carry up to ten pounds. (*Id*.) Plaintiff also indicated that she cooked and was independent in self-care activities, but that her daughter performed all the cleaning, laundry and shopping. (Record at 256.) At the October 20, 1999 examination, Dr. Balderman reported that plaintiff's gait and station were normal, that she ascended and descended the examination table without assistance, that her flexion, extension, lateral flexion, and lateral rotation of

---

[9]A non-steroidal anti-inflammatory medication. Mosby's Drug Consult, contained in STAT!Ref Medical CD/ROM Collection (Teton Data Systems, 4th Qtr. 2004).

the cervical spine were all normal, and further reported that he found no cervical or paracervical pain or spasm. (Record at 256.) He also noted that plaintiff's reflexes in her upper extremities were 2+ bilaterally and there were no motor or sensory abnormalities, that she had full range of motion in her arms, that she could perform fine motor activity without a problem, and that her grip strength was 5/5. (Record at 256-57.) His examination of the lumbar spine revealed limited motion. (Record at 257.) However, flexion was to twenty degrees, extension to fifteen degrees, lateral flexion to thirty degrees and lateral rotation was to forty-five degrees. (*Id*.) He reported finding no spinal tenderness or paraspinal muscle spasm, but observed that plaintiff could not perform straight leg raising, since even minimal manipulation of her lower extremities caused extreme pain. (*Id*.) He also reported that Lasegue sign[10] was negative bilaterally. (*Id*.) He did not find any atrophy or motor or sensory abnormalities in plaintiff's legs and determined that her quadriceps strength was 5/5. (*Id*.) Dr. Balderman determined that plaintiff's range of motion in the hips could not be evaluated due to her complaints of pain, and her left knee could only flex to 90° and 150° for the right one. (*Id*.) Dr. Balderman's wrote that his impression was lumbosacral spine sprain. (Record at 257.) He also noted that the severity was difficult to evaluate. (*Id*.) Additionally, Dr. Balderman stated that plaintiff's physical findings were not consistent with her history and MRI evaluation. (*Id*.) He concluded that there was no limitation in plaintiff's use of her hands or arms. (*Id*.) He indicated that the exam findings in her lower extremities were quite extreme and not consistent with the negative Lasegue

---

[10]A positive Lasegue sign is pain that radiates into the leg after the hips and knees are flexed and the knee is extended. Taber's Cyclopedic Medical Dictionary, (19th ed. 2001) contained in STAT!Ref Medical CD/ROM Collection (Teton Data Systems, 4th Qtr. 2004).

sign. (*Id*.) He also suggested a mental status evaluation to help determine the organicity of her complaints. (*Id*.)

On October 20, 1999, an AP and Lateral picture[11] were taken of plaintiff's spine. Dr. James T. Haggerty of Monroe Radiological Associates, P.C., interpreted the image as normal. (Record at 259.) Dr. Haggerty reported that plaintiff's vertebral bodies and intervertebral disc spaces were well maintained without evidence of break in the cortical margin or disruption of the trabecular pattern and that her bones were of proper density and the joint spaces, including the sacroiliac joints, were well defined. (*Id*.)

In a letter dated November 17, 1999, at the request of plaintiff's counsel, Dr. Romero responded to Dr. Balderman's October 20, 1999 assessment, described above, at the request of plaintiff's attorney. (Record at 264.) Dr. Romero wrote that plaintiff had been compliant with all treatment modalities and, "I have no reason to doubt the veracity of her complaints. Nor do I have any reason to believe that her complaints are somatic or 'organic' in nature, as Dr. Balderman speculates." (Record at 264. ) Dr. Romero also wrote that she had sent plaintiff for evaluation to neurosurgeon Dr. James Maxwell, and in his September 10, 1996 letter, Dr. Maxwell concluded that plaintiff suffered from severe degenerative disc disease. (*Id*.) Dr. Romero further indicated that Dr. Maxwell's diagnosis was confirmed in an August 1998 MRI. (*Id*.) She explained that plain x-ray films, to which Dr. Balderman referred, would not reveal these changes. (*Id*.) Dr. Romero concluded that because she had been treating plaintiff for several years, she was in a

---

[11]The document in the Record at 259 does not describe what type of image Dr. Haggerty inspected.

better position to assess plaintiff's condition, and she affirmed that plaintiff was disabled by her back impairment and deserving of disability benefits. (*Id*.)

## STANDARDS OF LAW

### *The Standard for Finding a Disability*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

The Social Security Administration ("SSA") has promulgated regulations which establish a five-step sequential analysis an ALJ must follow:

> First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities." If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501(citations and internal quotation marks omitted). Plaintiff bears the burden of proof for steps one through four. The burden of proof shifts to the Commissioner for the fifth step. *See DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir.1998); *Colon v. Apfel,* No. 98 Civ. 4732 (HB) 2000 WL 282898, *3 (S.D.N.Y., Mar. 15, 2000).

***The Standard of Review***

The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal*, 134 F.3d at 501. It is well settled that

> it is not the function of a reviewing court to determine *de novo* whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence; if they are supported by such evidence, they are conclusive.

*Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

Where there are gaps in the administrative record or where the Commissioner has applied an incorrect legal standard, remand for further development of the record may be appropriate. *Parker*, 626 F.2d at 235. However, where the record provides persuasive proof of disability and a remand would serve no useful purpose, the Court may reverse and remand for calculation and payment of benefits. *Id*.

Federal courts are not empowered to review the Commissioner's denial of disability benefits *de novo*. *See Williams v. Callahan*, 30 F. Supp. 2d 588, 592 (E.D.N.Y. 1998); *Fishburn v. Sullivan*, 802 F. Supp. 1018, 1023 (S.D.N.Y. 1992). The scope of review involves first the determination of whether the ALJ applied the correct legal standards, and second, whether the ALJ's decision is supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Although district court is not bound by the Commissioner's conclusions and inferences of law, the ALJ's findings and inferences of fact are entitled to judicial deference. *Grubb v. Chater*, 992 F. Supp. 634, 637 (E.D.N.Y. 1998). Absent legal error, the Commissioner's finding that a claimant is not disabled is

conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Filocomo v. Chater*, 944 F. Supp. 165, 168 (E.D.N.Y. 1996). Substantial evidence is more than a mere scintilla. It is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).

### *Treating Physician Rule*

The law gives special weight to the opinion of the treating physician. The SSA's regulations provide:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The various factors applied when the treating physician's opinion is not given controlling weight include: (1) the frequency of examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist; and (5) other relevant factors. *Id.* The regulations further provide that the SSA "will always give good reasons" for the weight given to the treating physician's opinion. 20 C.F.R. § 404.1527(d)(2) (2004); *see also*, *Schaal*, 134 F.3d at 503-504; *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

**ANALYSIS**

***Treating Physician Rule***

Plaintiff's first point is that the ALJ failed to accord proper weight to Dr. Romero's opinion. Specifically, plaintiff argues that the ALJ's conclusion, that Dr. Romero's opinion is not supported in the record, is erroneous. In that regard, plaintiff argues that Dr. Romero's opinion "is based primarily on her long-standing treating relationship with and clinical observation of Ms. Rivera." (Pl.'s Mem. of Law at 17. )

On the subject of Dr. Romero's medical opinion, the ALJ wrote:

> The Administrative Law Judge does not accord controlling weight to Dr. Romero's opinion because it is not supported by the evidence and is inconsistent with other substantial evidence. Although Dr. Romero indicates in her opinion that the claimant's condition has deteriorated, there is no evidence whatsoever of physical examination, clinical findings or any diagnostic testing to support this claim. In fact, the claimant is currently taking only plain [T]ylenol for her back pain, and occasionally using a heating pad. The only evidence of any abnormality is the August 1996 MRI showing degenerative disc disease at one disc level, L4-L5. Dr. Romero's opinion of the claimant's capabilities is inconsistent with the claimant's reported daily activities, as well as being inconsistent with the opinions of other physicians. Dr. Romero indicates that the claimant can only sit for 20 minutes, while the claimant testified to the ability to watch television for an hour at a time (Tr. 63).

Record at 206–07. Notwithstanding this detailed reason for not giving Dr. Romero's opinion controlling weight, the ALJ failed to follow the regulation's requirements. First, the regulation states that "[w]hen we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The ALJ's decision in this case, however, does not reveal whether he gave *any* weight to Dr. Romero's opinion, and if he did give it some weight, what that weight was.

The Commissioner cites to language in *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) as to the treating physician rule that permits "the opinions of nonexamining sources to override treating sources' opinions, provided they are supported by evidence in the record." This case authority certainly supports the Commissioner's position that the ALJ could find that a State agency physician's opinion to constitute substantial evidence sufficient to contradict a treating physician's opinion (Comm'r's Mem. of Law at 18). However,  it does not relieve the ALJ of his obligation under the Commissioner's regulation to reveal what weight, if any, he gave to the treating source's opinion.

**Plaintiff's Subjective Complaints of Pain**

Plaintiff also disputes the ALJ's treatment of her credibility. Social Security Ruling 98-7p requires that the ALJ set forth a detailed statement for his assessment of the claimant's credibility:

> 5. It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.
>
> * * *
>
> When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p, Purpose, Credibility. Here, the ALJ did make a finding that plaintiff had a "medically determinable impairment which could reasonably cause pain and impairment…." (Record at 207.) However, he then found that her "symptoms are not of such severity,

persistence or intensity to preclude work activity." (*Id*.) He discredited her complaints of extreme low back pain by stating those complaints were "undermined by the absence of doctor's visits for this problem. She testified that she does not need to see the doctor because this is a chronic condition. Similarly, the effectiveness of plain [T]ylenol over prescription medication raises the question of the severity of her pain." (*Id*., at 207-08.) The ALJ also determined that plaintiff's testimony lacked credibility, "because, although she claimed to not understand English, she did respond to questions at the hearing before they were translated." (*Id*., at 208.) Further, the ALJ noted that, "[a]lthough the claimant denied the ability to read or write [E]nglish, she spends a great deal of her time working word puzzles in English." (*Id*.)

Plaintiff correctly points out that, the ALJ may not "summarily discount subjective complaints" of pain, *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979) (Pl.'s Mem. of Law at 20), and that conservative treatment for pain is not, in and of itself, a sufficient basis for rejecting an applicant's complaints.  *See Sykes v. Apfel*, 228 F.3d 259, 266 n.9 (3d Cir. 2000). Plaintiff also explains that, due to the chronic nature of her back problems, she did not always make them the focus of her visits to Dr. Romero, whom she saw on a regular basis, and who treated her for more urgent problems as well (*e.g.* her gall bladder). (Pl.'s Mem. of Law at 21.) Further, plaintiff states that she did receive prescriptions stronger than Tylenol. (Pl.'s Mem. of Law at 21.)  In that regard, the record contains references to Daypro and Relafen, (Record at 152) Motrin (Record at 149), and Ibuprofen (Record at 186). It is true that Dr. Romero noted on June 15, 1999, that plaintiff found Tylenol was more helpful to her, (Record at 246). However, the ALJ's conclusion, that because Tylenol worked better

than prescription medication, plaintiff must not be suffering from severe pain, is not explained nor is it supported in  the Record.

In addition, the ALJ's conclusion that plaintiff lied about her ability to understand English is undermined by plaintiff's representative's statement that, "Ms. Rivera has an interpreter here today and we're not alleging that she is unable to speak any English at all. She speaks a limited amount of English. But in a circumstance such as this, she has difficulty without an interpreter." (Record at 269.) The ALJ also relied on his finding that plaintiff spent time doing word puzzles in English as a basis for finding her testimony that she could not communicate in English to be incredible. (Record at 208.) However, as the record reveals, the word puzzles, referred to during the hearing (Record at 286), consist of  "Spot-A-Word" puzzles. (Record at 251-54.) These are matrices of letters surrounded by written words with the objective, evidently, to find the letter patterns spelling out the words in the matrix of letters. It appears to the Court to be the type of puzzle sometimes present on children's place mats in restaurants. The Court concludes that since the English words are already spelled-out on the puzzles, recognizing the pattern of letters would not signify whether someone understood the written words, but would merely show that she is good at pattern recognition. Therefore, the Court determines that the ALJ's reasons for disregarding plaintiff's subjective complaints of pain are not supported by substantial evidence.

### The ALJ's Sequential Evaluation of Plaintiff's Claims

Finally, plaintiff alleges that the ALJ failed to properly follow the sequential analysis as required by *Schaal*, 134 F.3d at 501. The Commissioner concedes that plaintiff's past work may not constitute "past relevant work" within the meaning of the applicable

regulations, because it was not work that fit within the definition of significant gainful activity.[12] (Comm'r's Mem. of Law at 21.) As the Commissioner points out, the regulations do not direct a conclusion that her past work as a cleaner qualifies as past *relevant* work. *See* 20 C.F.R. §§ 404.1574(b)(6), 416.974(b)(6). Additionally, the ALJ's decision does not set forth the relevant information that caused him to conclude that her work as a cleaner was past relevant work. *See* 20 C.F.R. §§ 404.1573, 416.973 (factors to be considered in determining significant gainful activity). Thus, his conclusion that she could perform her past relevant work is erroneous as a matter of law.

Since the ALJ erroneously determined that plaintiff could perform her past relevant work, he did not complete the five-step sequential analysis, stopping, instead, at step four. *See* 20 C.F.R. § 404.1520(a)(4) ("If you can still do your past relevant work, we will find that you are not disabled.") Had he continued on to the fifth step, he would have been required to apply this regulation:

> At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520(a)(4)(v). However, the Commissioner argues that since the ALJ found that plaintiff could perform work at the medium physical exertional level, that finding supports the ALJ's ultimate determination that she was not disabled. The Commissioner asserts that the ALJ could have found that plaintiff, closely approaching advanced age,

---

[12]"*Definition of past relevant work*. Past relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1).

with limited education, with a medium residual functional capacity, and with previous work experience or who was unskilled, fit the criteria of Medical-Vocational Rule 203.18 in the grid, thereby directing a finding of not disabled. *See* Comm'r's Mem. of Law at 24; *see* 20 C.F.R. § 404, Subpart P, Appendix II, Table 3, § 203.18. Plaintiff counters  that if the residual functional capacity was found to be sedentary work, with either a limited ability, or no ability at all, to communicate in English, and was found to be unskilled, or no previous work experience, then a directed finding of disabled would be required. *See* 20 C.F.R. § 404, Subpart P, Appendix II, Table 1, § 201.09.

The regulations prescribe that the same residual functional capacity finding used in step four is used in step five as well. *See* 20 C.F.R. § 404.1545(a)(5)(ii) ("If we find that you cannot do your past relevant work (or you do not have any past relevant work), we will use the same assessment of your residual functional capacity at step five of the sequential evaluation process to decide if you can make an adjustment to any other work that exists in the national economy."). Here, the ALJ made a specific finding based on the medical evidence from the State agency review physician and Dr. Balderman that plaintiff could

> perform work requiring no more than 6 hours of sitting in an eight-hour workday, no more than 6 hours standing or walking in an eight hour workday, nor more than 50 pounds to lift or carry occasionally during the courts of an eight hour workday.

Record at 208. Plaintiff argues, essentially, that this finding is unsupported by substantial evidence. The Court agrees.

In his decision, the ALJ clearly set out that plaintiff testified to being able to sit for 30 to 60 minutes, the time of an average soap opera. (Record at 62-63 (plaintiff's testimony at the May 14, 1997 hearing); 207 (ALJ's decision of Jan. 25, 2000).) Nothing cited in his

opinion, however, supports the ALJ's conclusion that plaintiff is capable of, for example, six hours of sitting or lifting 50 pounds occasionally. Dr. Balderman's report does not contain any assessment of plaintiff's ability to sit, stand, reach, push, pull or lift. (Record at 255-58.) The ALJ's decision cites to two conflicting pieces of information in the Record, one being a September 1995 disability report (Record at 132-39), the other being plaintiff's May 1997 testimony (Record at 51). In the disability report, plaintiff wrote, "I can't lift over 10 pds. I shouldn't bend over sit down or stand for long periods of time." (Record at 135.) Her testimony consisted of answering the ALJ's question about how much she had to lift when she was working as a cleaner in 1992: "[e]nough….Maybe 30, 40 pounds." (Record at 51.) After citing this conflicting information, the ALJ concluded, "[i]n any event, the Administrative Law Judge finds that the claimant is not precluded from the performance of her past relevant work as a cleaner or maintenance supervisor by her functional limitations." (Record at 208.) This evaluation of the facts does not demonstrate that the ALJ's determination is supported by substantial evidence.

## CONCLUSION

Accordingly, the Commissioner's decision is reversed, and the case is remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g) for a rehearing.

It is So Ordered.

Dated: December 9, 2005
       Rochester, New York

                    ENTER.


                    /s/ Charles J. Siragusa
                    CHARLES J. SIRAGUSA
                    United States District Judge

-22-